IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
Rome Division

| | |
|---|---|
| ALETIA MOON and ZACHARY CARRIER | ) ) ) |
| Plaintiff, | ) |
| vs. | ) ) |
| ADVANCED MEDICAL OPTICS, INC. | ) ) ) ) ) |
| Defendant. | ) |

CIVIL ACTION

FILE NO. 4:08-CV-021 - HLM

**BRIEF IN OPPOSITION TO DEFENDANT'S MOTION FOR PARTIAL SUMMARY JUDGMENT**

Statement of Facts

Defendant AMO received one complaint of acanthamoeba keratitis ("AK") associated with Complete MoisturePLUS in 2004 and zero complaints in 2005. (AMO Trend Review Report, May 16, 2007, Exhibit "1" filed under seal) In 2006, AMO received 12 complaints of AK associated with the use of Complete MoisturePLUS as identified in the trend report on May 16, 2007 completed by AMO. (AMO Trend Review Report, May 16, 2007, Exhibit "1" filed under seal)

AMO documented 9 of the 12 complaints in 2006 as outlined below:

(1) 2/28/06, CLCP #61130: ophthalmologist reported female patient contracting acanthamoeba keratitis while using Complete MoisturePLUS. Microscopic inspection of remaining solution in bottle was positive for likely acanthamoeba in the solution;

(2) 2/28/06, CLCP #61131: ophthalmologist reported additional patient contracting acanthamoeba keratitis while using Complete MoisturePLUS. Microscopic inspection of remaining solution in bottle was positive for likely acanthamoeba in the solution;

(3) 4/18/06, CLCP #65138: female patient contracted acanthamoeba keratitis in 2005 while using Complete MoisturePLUS;

(4) 5/29/06, CLCP #68786: AMO representative reported that in 2005 three out of four cases of acanthamoeba keratitis at office in his territory were patients using Complete MoisturePLUS;

(5) 8/31/06, CLCP #76379: AMO was informed by FDA that patient reported that he/she contracted acanthamoeba keratitis after using Complete MoisturePLUS despite compliance with solution regimen and no known risk factors;

(6) 10/9/06, CLCP #79664: AMO was informed by FDA of possible acanthamoeba or fungal infection reported while patient was using Complete MoisturePLUS;

(7) 11/14/06, CLCP #82755: AMO was informed by FDA that patient reported contracting acanthamoeba keratitis in November of 2005 while using Complete MoisturePLUS and reported that 8 out of 17 people in her support group had also contracted acanthamoeba keratitis while using Complete MoisturePLUS;

(8) 11/17/06, CLCP #83458: AMO was informed by FDA that mother reported that son, who had been using contact lenses for four years, developed acanthamoeba keratitis while using Complete MoisturePLUS;

(9) 11/22/06, CLCP #83616: mother reported that son, who was new contact lens wearer, developed acanthamoeba keratitis while using Complete MoisturePLUS.

(Adverse Event Reports, Exhibit "2" filed under seal)

In April of 2006, AMO tested two bottles of solution and discovered that acanthamoebae was living and growing inside the solution. (Documents Concerning Testing of Solution, Exhibit "3" filed under seal) Kate Ambrus, chief microbiologist at AMO, was concerned to find the organism living in the solution because she had never heard of or seen that happen in the past with any brand of solution. (Ambrus Depo. p. 228 ln. 12 through p. 231 ln. 5) Despite these concerns and the alarming trend of a spike in AK cases in 2006, there is no evidence that

anyone at AMO investigated why the organism was able to live inside the solution bottles. There is no evidence that AMO conducted any testing to try and determine the relationship between AK and Complete MoisturePLUS before the recall. After the acanthamoebae were found living in the solution bottles, AMO continued to receive complaints about consumers contracting AK while using Complete MoisturePLUS. (Adverse Event Reports, Exhibit "2" filed under seal) On November 14, 2006, AMO received another report from a consumer contracting AK while using its product. This time the consumer stated "I strongly believe the solution is ineffective because 8 out of 17 or 59 percent of Acanthamoeba victims that I know of in our MADD group – see Prevent Blindness America's Web forum – have used Complete solution. That is more than a coincidence." (Adverse Event Reports, Exhibit "2" filed under seal)

If AMO had conducted basic on-line research, it would have discovered that multiple people in support groups were complaining about Complete MoisturePLUS causing AK at an alarming rate. (On-line Support Group Printouts, Exhibit "4") The failure to step forward and warn consumers about this safety issue with Complete MoisturePLUS and to address the issue amounts to a conscious indifference to the safety of the public that warrants imposition of punitive damages. (Affidavit of Dr. Michael Miller, Exhibit "5") If AMO had taken these steps in November of 2006, Zach Carrier, more likely than not, would not have

developed acanthamoeba keratitis after using Complete MoisturePLUS in mid December of 2006. (Affidavit of Dr. Michael Miller, Exhibit "5") AMO did not submit Medical Device Reports ("MDR") to the FDA for 8 of the 12 complaints in violation of federal regulations until after the recall. (483 Sanction, Exhibit "6") AMO received a sanction from the FDA as part of the form 483 inspection for failing to submit an MDR on these complaints. (483 Sanction, Exhibit "6")

Even as AK complaints continued to pour into AMO in early 2007, AMO still did not do any investigation or testing on the product until AFTER the FDA ordered a recall on May 23, 2007. (*Root Cause Assessment for Acanthamoeba Keratitis Risk Associated with Use of Complete MoisturePLUS Multipurpose Solution*, John M. Lally, October 12, 2007, Exhibit "18" to Miller Affidavit dated February 22, 2010) After the recall, it was determined that 56 % of all contact wearers that had contracted AK in 2006 and up to May 23, 2007 were using Complete MoisturePLUS despite a less than 10% market share. (CDC Memorandum from Jennifer Verani, November 9, 2007, Exhibit "17" to Miller Affidavit dated February 22, 2010; Certified Copy of Powerpoint Presentation: *Multistate Outbreak of Acanthamoeba Keratitis Associated with Use of a Contact Lens Solution*, June 10, 2008, Verani, Exhibit "15" to Miller Affidavit dated February 22, 2010) Within weeks of conducting testing on the product, AMO determined that the product's new ingredients of propylene glycol and taurine

caused the encystment of acanthamoebae allowing the organism to survive the disinfectant. (*Root Cause Assessment for Acanthamoeba Keratitis Risk Associated with Use of Complete MoisturePLUS Multipurpose Solution*, John M. Lally, October 12, 2007, Exhibit "18" to Miller Affidavit dated February 22, 2010)

AMO's failure to submit MDRs on these complaints shows a general lack of care and understanding of the importance of looking at and reporting complaints to identify adverse event trends that will identify safety issues with the product. (Affidavit of Dr. Michael Miller, Exhibit "5")  AMO should have been alarmed and extremely concerned to learn that acanthamoeba was living and proliferating within the solution bottle in April of 2006 since the disinfectant within the solution is supposed to at least inhibit the growth of the organism, and it is rare in the industry to have protozoa living inside the solution within the bottle. AMO should have begun conducting testing on Complete MoisturePLUS to investigate why the acanthamoeba was living within the solution shortly after learning of these results but no later than June of 2006, especially since additional reports of acanthamoeba keratitis were received in April and May of 2006. (Affidavit of Dr. Michael Miller, Exhibit "5") If AMO was following safe industry standards, it would have begun conducting testing on Complete MoisturePLUS to investigate why the acanthamoeba was living within the solution shortly after learning of these results but no later than June of 2006. (Affidavit of Dr. Michael Miller, Exhibit "5") To a

reasonable degree of medical certainty, AMO would have discovered through adequate testing the problem with encystment within weeks of starting an investigation given the short period of time that this discovery was made after the recall on May 23, 2007. (Affidavit of Dr. Michael Miller, Exhibit "5") As more reports of acanthamoeba keratitis continued in August and October of 2006, AMO should have realized that there was a problem with the solution as it related to inhibiting the growth of acanthamoeba and realized an even greater urgency to begin testing on the product. (Affidavit of Dr. Michael Miller, Exhibit "5")

When AMO received the report on November 14, 2006 that 8 of 17 people in a support group for acanthamoeba keratitis patients reported using Complete MoisturePLUS, they should have immediately and emergently investigated all aspects of the relationship of Complete MoisturePLUS to developing acanthamoeba keratitis and issued warnings to consumers about the potential relationship between the product and the disease. (Affidavit of Dr. Michael Miller, Exhibit "5") If AMO was following safe industry standards, it would have immediately and emergently investigated all aspects of the relationship of Complete MoisturePLUS to developing acanthamoeba keratitis and issued warnings to consumers about the potential relationship between the product and the disease by November 14, 2006. (Affidavit of Dr. Michael Miller, Exhibit "5") It was dangerous, reckless and showed a conscious indifference to the safety of the

public for AMO to not have launched a full scale emergent investigation into the relationship between Complete MoisturePLUS and acanthamoeba keratitis and issued warnings to consumers about the potential relationship between the product and the disease by November 14, 2006. (Affidavit of Dr. Michael Miller, Exhibit "5") To a reasonable degree of medical certainty, Zach Carrier would not have developed acanthamoeba keratitis if AMO had followed safe industry practices since Carrier purchased the product in mid-December of 2006 and the product either would have been recalled by that date or consumers such as Zach Carrier would have been notified of the problems with the product and would not have used it. (Affidavit of Dr. Michael Miller, Exhibit "5")

Argument & Citation of Authority

I.   Plaintiffs Agree to Dismiss Claims for Manufacturing Defect, Breach of Express Warranty, Fraudulent Misrepresentation and Fraudulent Concealment

Plaintiffs agree to dismiss their claims for manufacturing defect, breach of express warranty, fraudulent misrepresentation and fraudulent concealment because either the remedy for these claims are contained within other claims brought by Plaintiffs or there is not enough evidence on these claims to submit them to the jury.

II.     Defendant's Deliberate Indifference to Known Safety Problems Disclosed through Adverse Event Reports Means that Punitive Damages Must be Decided by a Jury

Punitive damages may be awarded by a jury for a manufacturer's indifference to safety issues with its product even if the manufacturer complies with all federal regulations governing the manufacture of the product. Watkins v. Ford Motor Company, 190 F.3d 1213, 1217-1218 (11th Cir. 1999) citing General Motors Corp v. Moseley, 213 Ga. App. 875, 447 S.E.2d 302 (1994). When a manufacturer is placed on notice of a safety issue with its product by virtue of complaints and adverse event reports and fails to warn consumers about this safety issue or fails to take steps to protect the public from the product, then the manufacturer has exhibited a level of recklessness or indifference to the consequences that will support an award of punitive damages. Reid v. BMW of North America, 430 F.Supp.2d 1365 (N.D.Ga. 2006). In Reid, a service technician at a Pep Boys Automotive Center was burned when a radiator on a BMW E36 series suddenly exploded causing boiling radiator fluid to spray onto him. Prior to this incident, there had been other reported cases of radiators on the E36 series spraying boiling fluid on other individuals. Plaintiff's claim for punitive damages rested entirely on the failure to issue warnings about the radiator based on these

adverse event reports. Although BMW argued that punitive damages were not warranted because they complied with all federal regulations and did not engage in intentional misconduct, the Court held that BMW's failure to warn about and address the safety issue with the radiator after receiving prior complaints was the type of conduct that a jury could decide showed conscious indifference to the consequences. "If BMW did know of a defect in the radiator and did nothing about it, punitive damages may be appropriate. In addition, even if there are applicable regulations or standards and the BMW defendants complied with such regulations, other evidence showing culpable behavior can still justify an award of punitive damages." Id. at 1374. See also Mascarenas v. Cooper Tire & Rubber Co., 643 F.Supp.2d 1363 (S.D.Ga. 2009) (Failure to warn about and address problem with tires may be punitive given earlier complaints about tire failures)

In the present case, AMO received only one complaint about acanthamoeba keratitis ("AK") in 2004 and zero in 2005. (AMO trend review May 16, 2007, Exhibit "1" filed under seal) Suddenly in 2006, AMO began receiving multiple complaints about AK in users who were using Complete MoisturePLUS. (Adverse Event Reports, Exhibit "2" filed under seal) In April of 2006, AMO tested two bottles of solution and discovered that acanthamoebae was living and growing inside the solution. (Documents concerning Testing of Solution, Exhibit "3" filed under seal) Kate Ambrus, chief microbiologist at AMO, was concerned to find the

organism living in the solution because she had never heard of or seen that happen in the past with any brand of solution. (Ambrus Depo. p. 228 ln. 12 through p. 231 ln. 5) Despite these concerns and the alarming trend of a spike in AK cases in 2006, no one at AMO investigated why the organism was able to live inside the solution bottles. AMO conducted no testing to try and determine the relationship between AK and Complete MoisturePLUS. After the acanthamoebae were found living in the solution bottles, AMO continued to receive complaints about consumers contracting AK while using Complete MoisturePLUS. (Adverse Event Reports, Exhibit "2" filed under seal) Still AMO did nothing. On November 14, 2006, AMO received another report from a consumer contracting AK while using its product. This time the consumer stated "I strongly believe the solution is ineffective because 8 out of 17 or 59 percent of Acanthamoeba victims that I know of in our MADD group – see Prevent Blindness America's Web forum – have used Complete solution. That is more than a coincidence." (Adverse Event Reports, Exhibit "2" filed under seal)  If AMO had conducted basic on-line research, it would have discovered that multiple people in support groups were complaining about Complete MoisturePLUS causing AK at an alarming rate. (On-line Support Group Printouts, Exhibit "4") The failure at this point to step forward and warn consumers about this safety issue and to address the issue amounts to a conscious indifference to the safety of the public that warrants imposition of punitive

damages. (Affidavit of Dr. Michael Miller, Exhibit "5") If AMO had taken steps to investigate the relationship between AK and Complete MoisturePLUS in November of 2006, Zak Carrier, more likely than not, would not have developed acanthamoeba keratitis in mid December of 2006. (Affidavit of Dr. Michael Miller, Exhibit "5")

AMO's intentional failure to address these complaints is even more concerning given that they also failed to report these complaints to the FDA as Medical Device Reports ("MDR") in violation of federal regulations. (483 Sanction, Exhibit "6") AMO's pattern and practice of ignoring safety issues with its product is confirmed not only by the failure to file the MDRs but also because even as AK complaints continued to pour into AMO in early 2007, they still did not do any investigation or testing on the product until AFTER the FDA ordered a recall on May 23, 2007. After the recall, it was determined that 56 % of all contact wearers that had contracted AK in 2006 and up to May 23, 2007 were using Complete MoisturePLUS despite a less than 10% market share. Ironically, this is almost the exact same percentages found in support groups as reported to AMO in November of 2006 by a consumer who contracted AK while using AMO's product. Within weeks of conducting testing on the product, AMO determined that the product's new ingredients of propylene glycol and taurine caused the encystment of acanthamoebae allowing the organism to survive the disinfectant in

the solution. If AMO had not turned a blind eye to the adverse event reports and the safety issues disclosed by consumer complaints with its product, Zach Carrier's infection never would have occurred. A jury must decide if punitive damages are warranted in this case.

## Conclusion

Accordingly and for the foregoing reasons, Plaintiffs respectfully request that Defendant's motion for summary judgment on punitive damages be denied.

Dated on April 1, 2010.

                                            FRIED ROGERS GOLDBERG LLC

                                            */s/ Michael L. Goldberg*
                                            MICHAEL L. GOLDBERG
                                            GEORGIA STATE BAR NUMBER 299472

                                            ATTORNEYS FOR PLAINTIFF

3399 PEACHTREE ROAD, N.E.
SUITE 325
ATLANTA, GEORGIA 30326
404-591-1800
404-591-1801(Fax)

## CERTIFICATE OF COMPLIANCE

The undersigned hereby certifies that the foregoing pleading complies with the font and point selections approved by the Court in Local Rule 5.1C. This brief has been prepared in Times New Roman font, 14 point.

Dated on April 1, 2010.

                                                                           FRIED ROGERS GOLDBERG LLC


                                                                           */s/ Michael L. Goldberg*
                                                                           MICHAEL L. GOLDBERG
                                                                           GEORGIA STATE BAR NUMBER 299472


                                                                           ATTORNEYS FOR PLAINTIFF

3399 PEACHTREE ROAD, N.E.
SUITE 325
ATLANTA, GEORGIA 30326
404-591-1800
404-591-1801(Fax)

# CERTIFICATE OF SERVICE

I hereby certify that I have on this day electronically filed the foregoing **PLAINTIFFS' RESPONSE TO DEFENDANT'S MOTION FOR PARTIAL SUMMARY JUDGMENT** with the Clerk of Court using the CM/ECF system, which will automatically send email notification of such filing to the following attorney of record:

> Z. Ileana Martinez
> Thompson Hine LLP
> One Atlantic Center
> 1201 West Peachtree Street, NW
> Suite 2200
> Atlanta, Georgia 30309-3449

Dated on April 1, 2010.

> FRIED ROGERS GOLDBERG LLC
>
> */s/ Michael L. Goldberg*
> MICHAEL L. GOLDBERG
> GEORGIA STATE BAR NUMBER 299472
>
> ATTORNEYS FOR PLAINTIFF

3399 PEACHTREE ROAD, N.E.
SUITE 325
ATLANTA, GEORGIA 30326
404-591-1800
404-591-1801(Fax)