IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ROME DIVISION

| | |
|---|---|
| ALETIA MOON and ZACHARY CARRIER | ) |
| | ) |
| Plaintiffs, | ) |
| | ) CIVIL ACTION |
| vs. | ) |
| | ) FILE NO. 4:08-CV-021-HLM |
| ADVANCED MEDICAL OPTICS, INC. | ) |
| | ) |
| Defendant. | ) |

### DEFENDANT ADVANCED MEDICAL OPTICS, INC.'S REPLY IN SUPPORT OF ITS MOTION FOR PARTIAL SUMMARY JUDGMENT

Defendant Advanced Medical Optics, Inc., n/k/a Abbott Medical Optics, Inc. ("AMO"), submits its Reply in support of its Motion for Partial Summary Judgment, respectfully showing this Court as follows:

### I.   PRELIMINARY STATEMENT

Plaintiffs oppose AMO's motion for partial summary judgment on the punitive damages claim.[1] Plaintiffs allege that because AMO received 1 complaint in 2004 and 12 complaints in 2006, regarding consumers who contracted Acanthamoeba Keratitis ("AK") while allegedly using Complete MoisturePlus Multipurpose Solution ("CMP"), they should have: (1) recognized this "alarming trend of a spike in AK cases in 2006;" (2) conducted testing "to try and determine

---

[1] As Plaintiffs' Opposition concedes, summary judgment is warranted on Plaintiffs' claims for Manufacturing Defect, Breach of Express and Implied Warranty, Fraudulent Misrepresentation, and Fraudulent Concealment.

the relationship between AK and [CMP];" (3) conducted on-line research which purportedly would have shown that "multiple people in support groups were complaining about [CMP] causing AK at an alarming rate;" and (4) "step[ped] forward and warn[ed] consumers about this safety issue."  In sum, Plaintiffs contend that AMO mishandled 12 consumer complaints, and had AMO investigated these complaints, they would have found, "to a reasonable degree of medical certainty … the problem with encystment within weeks of starting an investigation given the short period of time that this discovery was made after the recall on May 23, 2007."

     Plaintiffs have failed to meet their burden, as required under Georgia law to warrant the imposition on AMO of punitive damages.  Plaintiffs posit that in *November 2006*, AMO should have recognized an increased trend of AK complaints, conducted an investigation, discovered an association between CMP and AK, conducted further investigation to find "within weeks" that CMP causes some Acanthamoeba to encyst, and then warned or recalled the product before Carrier allegedly used it in *December 2006*.  There no evidence to support such a scenario, and the suggested chain of events is as preposterous as Plaintiffs' claim that AMO's inability to come up with new scientific discoveries "within weeks" warrants the imposition of punitive damages.

2

Moreover, Plaintiffs' position is glaringly ironic given that their product defect claim rests on the CDC's investigation. The CDC took more than a year (May 2006 to May 2007) to develop preliminary data, took several months thereafter to develop and analyze final data, and another two years to publish its findings.[2] Plaintiffs now seek to impose on AMO a duty to have developed that same data in weeks, rather than years, and assert that its failure to make new scientific discoveries[3] within this time frame requires the imposition of punitive damages. No such duty exists under Georgia law.

As a matter of law, 12 consumer complaints out of millions of units sold is insufficient to establish a product defect, proof of injury, increased risk, or liability, and therefore is likewise insufficient to establish the heightened Georgia punitive damages requirement. AMO investigated the complaints and concluded that the solution did not cause those consumers' AK, and Plaintiffs cite to no published scientific literature supporting a conclusion that CMP (or any other contact lens solution) was responsible for AK or the increase in AK cases reported in 2005 to 2006.

---

[2] *Exhibit* 1, Centers for Disease Control and Prevention, Acanthamoeba Keratitis – Multiple States, 2005-2007, MMWR 2007; 56: 532-34 (May 27, 2007) ("CDC Study,") at 1; *Exhibit 2,* Verani, J., *National Outbreak of Acanthamoeba Keratitis Associated with Use of a Contact Lens Solution,* United States, Emerging Infectious Diseases, Vol. 15, No. 8 (August 2009) ("Verani 2009 Article"), at 1240-41.

[3] Even today, years after the CDC study, AMO's Root Cause Analysis, and the scientific community's continued investigation, no one knows what role, if any, encystment plays in the development of clinical disease.

## II.   ARGUMENT AND CITATION OF AUTHORITIES

### A.   The punitive damages claim cannot be based on 12 adverse event reports in 2006 as a matter of law.

Plaintiffs assert that AMO's handling of 12 adverse event reports in 2006 is clear and convincing evidence of AMO's malicious, fraudulent or outrageous behavior, as is required to obtain a punitive damage award under the Georgia law. *See Wardlaw v. Ivey*, 297 Ga. App. 240, 242, 676 S.E.2d 858, 861 (2009). As a matter of law, Plaintiffs' assertion is wrong. Adverse event reports ("AER") must be viewed in the appropriate context. As explained by the Eleventh Circuit, AERs reflect consumer complaints which do not have "any medical controls or scientific assessment," and are "one of the least reliable sources to justify opinions about general and specific causation," that is, whether a product can cause disease or did, in fact, cause disease. *McClain v. Metabolife Intern., Inc.*, 401 F.3d 1233, 1250 (11th Cir. 2005).

Indeed, the Eleventh Circuit recently addressed an argument comparable to that asserted by Plaintiffs here, and concluded that 17 case reports did not support the allegation that a manufacturer knew or should have known that its product posed a risk and therefore granted summary judgment in favor of the manufacturer. *Stupak v. Hoffman-La Roche, Inc.*, 326 Fed.Appx. 553, 560 (11th Cir. 2009). *Stupak considered* whether the manufacturer of Accutane failed to warn of the risk

4

of suicide without premonitory symptoms. *Id* at 554. The *Stupak* court held: "it is clear that [the AERs] are anecdotal, and do not establish whether the seventeen suicides reported were in fact asymptomatic, or whether the symptoms were simply not recorded in some of the case reports . . . *Seventeen such inconclusive case reports (out of millions of Accutane prescriptions) is simply insufficient to support an allegation that Roche knew or should have known that Accutane could cause suicide without premonitory symptoms.*" *Id.* at 560 (emphasis supplied).

If 17 complaints in *Stupak* were insufficient to support either a manufacturer's knowledge of a risk, or liability for failure to warn, then the 12 complaints relating to CMP here fall woefully short of providing clear and convincing evidence of a risk about which AMO allegedly knew or should have known.[4]  *Hollander v. Sandoz Pharms. Corp.,* 289 F.3d 1193, 1202 (10th Cir. 2002) (case reports are problematic because they are not controlled studies and do not rule out alternative explanations); *Haggerty v. Upjohn Co.,* 950 F. Supp. 1160, 1165 (S.D. Fla. 1996), *aff'd,* 158 F.3d 588 (11th Cir. 1998) (same); *Pauley v. Bayer Corp.*, 2002 No. 2729, 2006 WL 463866, *2 (Pa. Com. Pl. 2006) (same); *In re Breast Implant Litig.,* 11 F.Supp.2d 1217, 1227-1228 (D. Colo. 1998) (AERs

---

[4] When these 12 complaints are viewed against the millions of units sold, they do not support knowledge to AMO of a product defect or problem. In 2006, Joslin estimated that there were 34 million contact lens users and CMP had 10% of the multipurpose solution market. *Exhibit 3,* Joslin, *et al.* "The Association of Contact lens Solution Use and Acanthamoeba Keratitis,*" American Journal of Ophthalmology,* 2007; 133: 169-180 (Aug. 2007) at 177.

"suggest only a potential, untested hypothesis that [the product] may be their cause"); *Willert v. Ortho Pharm. Corp.,* 995 F. Supp. 979, 981 (D. Minn. 1998) (case reports are not sufficient evidence of causation because they do not exclude other alternative explanations); *Adverse Drug Reaction Monitoring,* 314 New Eng. J. Med. 1589, 1591 (1996) ("…one or even many reports of adverse reactions often do not provide sufficient information to confirm that a drug caused the reaction").

At most, anecdotal reports <u>may</u> generate a "potential, untested hypothesis." *In re Breast Implant Litig.,* 11 F.Supp.2d at 1228. Even drawing all inferences in favor of Plaintiffs, the handful of complaints AMO received in 2006, at most, could create a *hypothesis* that CMP may be contributing to AK, which would have required the development of a controlled epidemiological study to test the hypothesis.[5] Even had AMO engaged in such an epidemiological study, there is no probability that such a study would have yielded conclusive results. The CDC's informal data gathering yielded inconclusive results.[6] Likewise, the Wills Eye Center in Philadelphia conducted an epidemiological study and did not find that

---

[5] Reference Manual on Scientific Evidence (2000), at 338. Moreover, receiving more than 25 complaints of Acanthamoeba involving Vistakon's Acuvue Contact Lenses (most received after 2000) and more than 22 complaints of Acanthamoeba involving Bausch & Lomb's Renu Moisture Loc Contact Lens Solution (most received in 2006), did not cause the FDA to launch an investigation or initiate an epidemiological study. FDA's Manufacturer and User Facility Device Experience Database ("MAUDE") (1994 through May 25, 2007). http://www.accessdata.fda.gov/scripts/cdrh/cfdocs/cfMAUDE/TextSearch.cfm

[6] *Exhibit 1*, CDC Study at 1.

any solution, including CMP, increased the risk for AK.[7]

### B. **Plaintiffs misrepresent the record regarding AMO's investigation.**

In addition to the legal insufficiency of Plaintiffs' punitive damage claim erroneously based on 12 product complaints during 2006, Plaintiffs' discussion of these 12 complaints misrepresents the factual record. Plaintiffs then misleadingly collapse and distort events that occurred in 2006 with events that occurred in 2007, to allege that AMO knew or should have known that CMP "causes" AK.[8]

### 1. AMO's Investigation of Consumer Communications Relating to CMP.

At all relevant times, Sharon Chase-Jones was a team member in AMO's Product Safety and Compliance Group,[9] who confirmed that AMO followed the guidelines set out in the Code of Federal Regulations.[10] The CFR requires AMO to report consumer complaints of which it becomes aware, ***only*** if these events reasonably suggest that one of AMO's marketed devices (in this case CMP):

1)   May have *caused or contributed* to a death or serious injury; or
2)   Has *malfunctioned*, and a recurrence of the malfunction would likely

---

[7] *Exhibit 4*, K. Hammersmith, et al. *AK, A Parasite on the Rise*, Cornea, Volume 26, No. 6 (July 2007).

[8] For example, Plaintiffs omit that AMO researched each of the complaints. *Exhibit 5*, AMO's Complaint Files. Plaintiffs also misapply epidemiological terms by claiming that the 12 customer complaints show "an association" between CMP and AK, yet there was no evidence of an "association" until the CDC presented its preliminary data to AMO in May 2007. Moreover, an association is not causation. *Reference Guide on Epidemiology,* in *Reference Manual on Scientific Evidence* (2000) at 374.

[9] *Exhibit 6,* Deposition of Sharon Chase Jones given in *Jares v. AMO et al.*, Circuit Ct. 11th Judicial Circuit, in and for Miami-Dade County, Florida, Case No. 08-27599CA32, ("Chase Dep. I") at 7. This department received feedback and communications from consumers, doctors, and other sources, recorded and investigated the complaints, requested, obtained, recorded and analyzed any available additional information, and determined whether the product may have caused the reported adverse event. *Exhibit 6,* ("Chase Dep. I") at 8, and 10; *Exhibit 5*, Complaint files.

[10] *Exhibit 6,* Chase Dep. I at 9.

cause or contribute to a death or serious injury.

21 C.F.R. § 803.3 (emphasis supplied).

From the time CMP was approved by the FDA for sale to the public through 2003, AMO received only 1 report of someone who claimed to have used CMP and developed AK. Then, for reasons still unknown, over the course of 2006, AMO received 12 reports from individuals who claimed to have developed AK and who reported having used CMP.[11] AMO thoroughly investigated each of these reports and, based on all of the available information, found the complaints were not reportable to the FDA in accordance with 21 C.F.R. §§ 803.1 and 803.3.[12] In several of these cases, the reporting doctors advised AMO that something other than CMP (e.g., the local water supply, swimming with contact lenses, or showering with contact lenses)[13] caused the patient to develop AK.[14] Therefore, absent evidence that would make these complaints reportable events, AMO did not initially submit these reports as Medical Device Reports ("MDRs") to the FDA.

Determinations of reportability are inherently a judgment made by professionals, such as Ms. Chase-Jones. AMO exercised its judgment not to report

---

[11] During 2006, these reports trickled into AMO: 0 in January, 2 in February, 0 in March, 0 in April, 1 in May, 0 in June, 0 in July, 1 in August, 0 in September, 1 in October, and 3 in November.

[12] The FDA was already aware of 3 of these adverse event reports, #79664, #82755, #83458, as AMO received these reports from the FDA in October and November of 2006.

[13] *Exhibit 7*, Deposition of Kate Ambrus ("Ambrus Dep.") at 224, *Exhibit 9,* Chase Dep. II at 113.

[14] *Exhibit 5*, AMO Complaint files.

8

the 2006 complaints in the context of the following undisputed facts:

- CMP's formulation had not changed since its introduction to the market in 2003. Millions of CMP bottles were used from 2003 to 2005, yet as of January 2006, AMO had received only 1 Acanthamoeba AER in 2004;

- AMO was not aware of the CDC's preliminary data showing an association between CMP and AK until May 25, 2007, and the published scientific literature showed no association between AK and any multipurpose solution, and attributed AK to consumer non-compliance and/or contaminated water[15];

- There was no evidence in the scientific literature that any multipurpose formulation or component thereof may cause encystment of Acanthamoeba trophozoites; and

- Because of the publicity surrounding the recall of Bausch & Lomb's Renu MoistureLoc, beginning in April 2006, AMO had been receiving an increased number of complaints of all kinds.[16]

Instead of viewing the 12 complaints AMO received in the context of what was known in 2006 (when Plaintiff allegedly used CMP), Plaintiffs seek to impute

---

[15] *Exhibit 8*, Joslin, C. "Epidemiological Characteristics of a Chicago-Area Acanthamoeba Keratitis Outbreak," *American Journal of Ophthalmology 2006*: 142: 212-217 (Aug. 2006) ("Joslin August 2006 Article") (hypothesizes that change in water quality responsible for increased incidence of AK).

[16] *Exhibit 9,* Deposition of Sharon Chase-Jones, given in Coordinated Proceeding, In Re Complete, JCCP No. 4521, pending in the Superior Court of California, Orange County ("Chase Dep. II") at 209.

to AMO knowledge it did not have until after the CDC notified it on May 25, 2007, of the association between AMO and AK.[17] Such hindsight cannot form the basis for punitive damages.

Moreover, the FDA agreed with AMO's judgment that certain of the complaints were not reportable events.[18] Plaintiffs' claim that "AMO received a sanction from the FDA as part of the form 483 inspection for failing to submit an MDR on these complaints" is flatly wrong.[19] No one at the FDA ever determined that AMO violated the law or FDA regulations, nor was a Warning Letter ever issued to AMO by the FDA.

2. <u>Plaintiffs' Baseless Claims as to what AMO "should have done."</u>

Plaintiffs' Opposition makes multiple meritless assertions as to actions AMO "should" have taken in 2006 regarding complaints received, none of which serve as a basis for a punitive damages claim. Plaintiffs first allege that, in April 2006, AMO tested two bottles of solution and discovered that Acanthamoeba was "living and *growing* inside the solution," and that this should have prompted

---

[17] *Exhibit 10*, October 12, 2007 Root Cause Assessment of Acanthamoeba Keratitis Risk Associated with the use of (CMP) (hereinafter "Root Cause Investigation"), at 2.

[18] *Exhibit 11*, FDA Establishment Inspection Report ("EIR") at 23. The FDA inspector noted that two complaints (numbers 14345 and 70006) "were not included in the observations because there was strong verbiage in the complaint files that the complainant or their physician felt the root cause was due to swimming in a pool, or wearing lenses while showering."

[19] Subsequently, in April 2007, after noting the increased number of AK complaints reported to AMO throughout 2006, AMO conducted a re-analysis of the 2006 AK event reports, determined that the events should be reported to the FDA, and began preparing the appropriate documentation for FDA submission. *Exhibit 18,* AMO's May 16, 2007 Trend Review Report; *Exhibit 11*, EIR Report at 24; *Exhibit 9*, Chase Dep. II at 169. Before AMO completed this process, on May 25, 2007, the CDC informed AMO of its suspected "association" between CMP and AK.

further investigation on the part of AMO as to why Acanthamoeba was able to live inside the solution bottles. As an initial matter, there is no evidence that the protozoa found in the two bottles was "growing." Explained accurately, in April 2006, Kate Ambrus, the Chief Microbiologist at AMO, tested two bottles of CMP received from the AMO patient complaint department.[20] Ambrus confirmed only that the bottles contained viable protozoa, but not necessarily Acanthamoeba.[21] Ambrus suspected that it was Acanthamoeba[22] because at the time of her testing, she knew that the bottles were provided by a Florida doctor who was treating a couple of patients diagnosed with AK.[23]

AMO's investigation also determined that the bottles were not contaminated at AMO's manufacturing facility.[24] Plaintiffs' assertion that AMO should have investigat[ed] why the organism was able to live inside the solution bottles," ignores the undisputed fact that neither CMP nor any of the multi-purpose solutions are capable of killing all Acanthamoeba, as noted in the medical and

---

[20]*Exhibit 7*, Ambrus Dep. at 208 and 224.
[21]*Exhibit 7,* Ambrus Dep. at 215, 218 and 234.
[22]Ambrus could not tell if what she found was Acanthamoeba. It could have been an organism, called Entamoeba histioloca, that looks similar. *Exhibit 7,* Ambrus Dep. at 215, 218, 234.
[23]*Exhibit 7,* Ambrus Dep. at 224. This doctor had informed AMO that local contaminated water was the most likely source of the AK in these patients. *Exhibit 8*, Complaint 61130/61131, Complaint File at 1.
[24]*Exhibit 7*, Ambrus Dep. at 1552-1561. Ambrus believed that the consumer had contaminated the bottles of solution.

scientific literature.25  Moreover, at the time the two bottles of CMP were tested (February – April 2006), having only received 2 complaints of AK, AMO had no reason to suspect an association between CMP and AK.  Plaintiffs' attempt to impute to AMO knowledge it acquired in May of 2007, from the CDC, to assert that AMO should have acted differently at an earlier point in time, is inappropriate and not supported by the factual record or applicable law.

Finally, Plaintiffs' contention that AMO should have "discovered," via Internet resources, that multiple people in support groups were complaining about CMP causing AK is baseless.  AMO has found no law that imposes a duty on AMO to monitor the entire online world for unverifiable complaints regarding its product.  A similar argument was made and rejected by the court in *Smallwood v. Clairol, Inc.,* No. 03 CV 8394SWK, 2005 WL 425491, *2 (S.D.N.Y. Feb. 18, 2005) (unauthenticated, uncorroborated hearsay materials found on the Web are not lluminative and cannot be considered on a motion for summary judgment."). *Id.*  Consumer complaints posted on Internet forums are wholly unreliable (even more so than AERs) and are insufficient to support Plaintiffs' contention that AMO had a duty to monitor the Internet or to warn, and cannot provide a basis for

---

25*Exhibit 7,* Ambrus Dep. at 229; *Exhibit 12,* Annex D to International Organization of Standards ("ISO") 14729, *Contact lens care products – Microbiological requirements and test methods for products and regimens for hygienic management of contact lenses* (2001) ("ISO 14729"), adopted by the FDA in 2002. FDA standards still in use today, do not require disinfection efficacy for Acanthamoeba.

punitive damages.

C. **The case law Plaintiffs rely upon in their Opposition does not support the imposition of punitive damages in this matter.**

Plaintiffs' authority does nothing to buttress their position. Rather, it underscores why Plaintiffs' punitive damage claim is unsupportable as a matter of law. *See, e.g.*, *Watkins v. Ford Motor Co.*, 190 F.3d 1213, 1217 (11th Cir. 1999) (punitive damages appropriate where an "array of evidence" showed manufacturer had knowledge of specific safety issue and decided "to forego recommended safety alterations … because it would either delay production or profits would be sacrificed."); *Mascarenas v. Cooper Tire & Rubber Co.*, 643 F.Supp.2d 1363, 1374 (S.D. Ga. 2009) (manufacturer's summary judgment motion denied where evidence showed it rejected alternative designs adopted by other tire manufacturers decades earlier "because they cut into [defendant's] profit margin").

This record is devoid of any evidence to suggest that, *at the relevant time period*, AMO knew of any design alternative that would have made CMP safer, or that any of its decisions were motivated by profit. Plaintiffs' own expert, Dr. Miller, concedes that, at the time Carrier allegedly used CMP, there was no information in the scientific literature concerning: (1) testing contact lens solutions for their ability to cause Acanthamoeba to encyst; (2) that immature cysts could cause infection; or (3) that contact lens solutions should be tested for effectiveness

13

against Acanthamoeba.[26] Indeed, to date, there is no scientific evidence as to the relevance of CMP, and specifically propylene glycol in CMP, to cause some Acanthamoeba to encyst, nor what role, if any, encystment plays in the infectious process and clinical disease. Nor is there evidence that any specific multipurpose solution design completely protects contact lens users from AK.[27]

Plaintiffs' reliance on *Reid v. BMW of N. America*, 430 F.Supp.2d 1365 (N.D. Ga. 2006), also is misplaced. In *BMW,* when the plaintiff was burned by radiator fluid that spewed from a radiator neck, BMW had knowledge from ***BMW dealers*** that the ***radiator necks were failing,*** had received between ***30,000-60,000 warranty claims*** concerning leaking radiators specifying neck failure, and had relevant testing and complaints relating to the problematic radiator necks. *Id.* at 1373. The court held: "[i]f the BMW defendants did know of a defect … and did nothing about it, punitive damages may be appropriate...." *Id.* at 1374.

Here, 13 sporadic and inconclusive reports of CMP users contracting AK, over more than three years, cannot, as a matter of law, rise to the level of the knowledge discussed in *BMW*. *See, supra, Stupak.* To the contrary, 13 reports – all of which were thoroughly investigated by AMO – were insufficient to place AMO on notice of any alleged defect. This is particularly true because: (1) a

---

[26] *Exhibit 13*, Deposition of Michael Miller, Ph.D. at 122:9-15, 201:10-18; 202:25-203:14, 213:8-214:2.
[27] *Exhibit 14, Kilvington, S. et al.* "Encystment of Acanthamoeba During Incubation in Multipurpose Contact Lens Disinfectant Solutions and Experimental Formulations," *Eye & Contact Lens* 34(3) (2008) at 133-139.

contact lens user or environment can introduce Acanthamoeba directly onto the cornea; (2) millions of people used CMP and AMO received a total of only *13 reports* of alleged CMP users who developed AK from 2003 to 2006; and (3) CMP's 2007 removal from the market did not decrease the incidence of AK to decrease.[28]

### III.   CONCLUSION

Courts nationwide and the FDA recognize that these 12 complaints received throughout 2006, standing alone, do not constitute "knowledge" of a problem with CMP. Plaintiffs' claim that a manufacturer is required not only to investigate the complaints (as AMO did), but also, to design epidemiological and scientific experiments and then make new scientific discoveries in weeks to avoid punitive damages, is without merit. According, AMO is entitled to summary judgment on Plaintiffs' punitive damages claim.

Respectfully submitted, this 19th day of April, 2010.

| | |
|---|---|
| THOMPSON HINE | BY:   /s/ Z. Ileana Martinez |
| 1201 West Peachtree Street, Suite 2200 | Z. Ileana Martinez |
| Atlanta, Georgia 30309-3449 | Georgia State Bar No. 474660 |
| T: (404) 541-2900; F: (404) 541-2905 | Leslie J. Suson |
| Ileana.Martinez@ThompsonHine.com | Georgia State Bar No. 142162 |

---

[28] *Exhibit 15*, Deposition of Oliver Schein, M.D. ("Schein Dep.") 42:3-15, 48:17 – 50:3; *Exhibit 16*, Affidavit of Claude Anger at ¶ 10. The 2008 AK incidence rate, after CMP's removal from the market, remained similar to infection rates while CMP was on the market. Schein Dep. at 58:13 – 60:17; 69:16 – 70:2; *Exhibit 17*, Yoder, S. "Surveillance for Acanthamoeba Keratitis after an Outbreak Associated with Use of a Contact Lens Solution," FDA Microbiological Testing for Contact Lens Care Products Workshop (January 22, 2009).

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that I have this day served a copy of the within and foregoing pleading upon all parties to this matter via electronic filing and/or by depositing a copy of same in the United States Mail, with adequate postage affixed thereto, addressed as follows:

Wade C. Hoyt, IV
The Hoyt Firm
P. O. Box 5005
Rome, GA  30162-5005

Michael L. Goldberg, Esq.
Fried Rogers Goldberg LLC
3399 Peachtree Road, NE
The Lenox Building, Suite 325
Atlanta, Georgia  30326-2835
michael@frg-law.com

This 19th day of April, 2010.

THOMPSON HINE LLP

BY:   /s/ Z. Ileana Martinez
      Z. Ileana Martinez
      Georgia State Bar No. 474660
      Attorneys for Defendant

One Atlantic Center, Suite 2200
1201 W. Peachtree Street
Atlanta, Georgia 30309-3449
PH:  (404) 541-2900
FX:  (404) 541-2905
Ileana.Martinez@ThompsonHine.com

## **LOCAL RULE 7.1 CERTIFICATION**

The undersigned counsel hereby certifies that this pleading was prepared with one of the font and point selections approved by the Court in LR 5.1B. Specifically, Times New Roman was used in 14 point.

So certified this 19th day of April, 2010.

Respectfully submitted,

/s/ Z. Ileana Martinez
Z. Ileana Martinez
Georgia Bar No. 474660
Counsel for Defendant

THOMPSON HINE LLP
One Atlantic Center, Suite 2200
1201 W. Peachtree Street
Atlanta, Georgia 30309-3449
PH: (404) 541-2900
FX: (404) 541-2905
Ileana.Martinez@ThompsonHine.com